475 So.2d 301 (1985)
STATE of Florida, Appellant,
v.
Jeffrey P. ARNOLD, Appellee.
STATE of Florida, Appellant,
v.
Jeffrey GARDINER, Appellee.
STATE of Florida, Appellant,
v.
Thomas E. MILLER, Appellee.
STATE of Florida, Appellant,
v.
Kevin WHITEHURST, Appellee.
Nos. 84-1952, 84-1953, 84-1954 and 84-1955.
District Court of Appeal of Florida, Second District.
September 18, 1985.
*303 Jim Smith, Atty. Gen., Tallahassee, and Candance M. Sunderland and Katherine V. Blanco, Asst. Attys. Gen., Tampa, for appellant.
Harrison T. Slaughter, Jr., P.A., Orlando, for appellee Arnold.
Wayne Pearsall, Tampa, for appellee Gardiner.
Mark L. Horwitz of Law Offices of Mark L. Horwitz, P.A., Orlando, for appellee Miller.
Robert A. Leventhal of Law Offices of Robert A. Leventhal, P.A., Orlando, for appellee Whitehurst.
SCHEB, Judge.
The state appeals the trial court's orders granting defendants' motions to suppress physical evidence and statements made by them. As to defendants Jeffrey Gardiner and Kevin Whitehurst, we affirm; as to defendants Jeffrey Arnold and Thomas Miller, we reverse.
The state filed informations charging the defendants with trafficking in cannabis in an amount greater than 10,000 pounds in violation of section 893.135, Florida Statutes (1983). The trial court's orders followed a single hearing on all four defendants' motions.
At that hearing the following facts were adduced. About 9:30 p.m. on March 5, 1984, Ken Sargent telephoned the Hendry County Sheriff's Office that a suspicious boat was on the Caloosahatchee River near his home. In response to the call, Deputy Sheriff Hollingsworth drove out to that area. He exited his vehicle and walked to the river's edge where he heard a motor running. He shined his flashlight in the direction of the noise and saw a shrimp boat on the other side of the river.
Hollingsworth returned to his car. He intended to cross a bridge on State Road 78 and turn on a marl road which would take him to the boat's vicinity. As he approached the bridge, he observed a vehicle on the marl road heading toward State Road 78. As Deputy Hollingsworth turned onto the marl road, he saw a white Fiat stopped about one hundred feet from the *304 intersection facing toward State Road 78. Two men, Charles Brunty and Defendant Jeffrey Arnold, were in the two-seater Fiat and a woman, Karma Brunty, was leaning into the window of the passenger side. Arnold was in the driver's seat.
About 9:50 p.m. Hollingsworth stopped his car in front of the Fiat. As Karma Brunty began walking past him, he asked her to stay so that he could talk to her. Hollingsworth then asked the two men to turn their car off and exit the vehicle. They complied with his request.
The surrounding area consisted primarily of palmettos, pine trees, and high grass. The officer observed that the two Bruntys were wearing deck shoes and Charles Brunty's clothes were soiled. He said that Mrs. Brunty looked fairly clean. Arnold's pants were soiled, but he was not wearing deck shoes.
Hollingsworth asked why the three were there. Karma Brunty explained that she and her husband, Charles, were having an argument, and they had pulled off the road to finish it. She said that they were traveling from Fort Myers to West Palm Beach. Deputy Hollingsworth asked Arnold why he was with the Bruntys. Arnold said he was Charles Brunty's brother. When asked why his last name was different, Arnold said he was a half brother.
Hollingsworth asked them for identification. After Arnold produced his driver's license, Hollingsworth ran a warrant check on him. Although no warrants were found, the dispatcher told Hollingsworth that Arnold had a prior trafficking conviction or arrest. At this point Deputy Kunkle arrived at the scene. Hollingsworth asked Kunkle to remain with these three people as he proceeded to the river.
It took Deputy Hollingsworth a minute to a minute and one-half to reach the boat, which was approximately half a mile away from the white Fiat. Hollingsworth got out of his car and saw what appeared to be cannabis on the ground in front of the boat. The cannabis was scattered as if thrown, not stacked. He estimated that the pile contained at least a hundred bales. Hollingsworth immediately told the dispatcher what he had found and then communicated with Kunkle to arrest Arnold and the Bruntys.
After Hollingsworth reached the boat, it took ten to thirteen minutes for other officers to arrive. When Highway Patrol Trooper Steve Worley pulled a shotgun out of his car trunk and slipped a round into the chamber, Steve Maydock leaped out of the bushes next to the patrol car and asked Worley not to shoot. Worley asked Maydock whether there were any other persons in the bushes and, if so, whether they were armed. Maydock responded that there were approximately twenty more people hiding in the bushes, none of them were armed, and some of them had left by car.
Hollingsworth then boarded the boat. He observed that the motor was running and that the boat was in forward gear. He found no one on board. When he went below deck, he saw bales of cannabis at the bottom of the forward hatch ladder and in front of the fuel tanks. He observed that the two forward fuel tanks had contained marijuana. He also saw the ship's manifest and log and noticed that the log listed Thomas Eugene Miller as a crew member.
About fifteen minutes later, Deputy Sheriff Kelly, the supervising officer of this operation, arrived. Deputy Hollingsworth informed Kelly of what he had already discovered, including Miller's name in the log. Thereafter, the officers took the boat to a marina and secured it.
The following morning the officers commenced a search of the surrounding area. Their investigation resulted in the arrests of Gardiner, Whitehurst, and Miller. Between 5:50 and 6:00 a.m., Deputy Sheriff Brant received a dispatch regarding a person on a bridge on State Road 78. Chief Deputy Kelly heard the same dispatch. Both officers drove to the bridge and observed Defendant Jeffrey Gardiner walking across it. They saw that his pants were wet and muddy, his shirt was inside out, and he had scratches on his face. *305 Both officers thought Gardiner had run through brush.
The officers stopped Gardiner and asked for some identification. He produced a valid Florida driver's license indicating his name. In response to questions, Gardiner said that he had come from the Handy Way Store. Before that, he had been at the Long Branch Bar. Further, while Gardiner could not give them the location of his motel, he showed them his key, which indicated the Starlight Motel, Room 38. Chief Deputy Kelly asked Gardiner where he got the scratches on his face. Gardiner asked, "What scratches?" At that point Kelly arrested him for importation and trafficking in marijuana and advised him of his Miranda rights.
While Deputy Brant took Gardiner to the sheriff's office, Chief Deputy Kelly went to the Starlight Motel to talk to the manager. He asked the manager the names of the persons registered in Room 38. The registry indicated that Jeffrey Arnold had rented the room for two persons. Chief Deputy Kelly told the manager that he had both Arnold and Gardiner in custody and wanted the room opened so he could pick up their belongings. The manager complied with the request. When Kelly entered the room, he saw a bag of marijuana on the bed. This search resulted in a warrantless seizure of items belonging to various persons, including Arnold and Gardiner.
At around 7:00 a.m. that same morning, Kelly again read Gardiner his Miranda rights. Gardiner said he understood his rights and wanted to cooperate. After signing a waiver-of-rights form, he said that Jeff Arnold had hired him to help unload the boat for $10,000. He then told Kelly the details of the planning and execution of the unloading operation.
After they had picked up Gardiner and returned to the police station, Chief Deputy Kelly told Deputies Brant and Campbell to return to the area where the boat had been found. While on State Road 78, near the Handy Way Store parking lot, they saw Defendant Kevin Whitehurst at a pay telephone some time between 7:00 and 8:45 a.m. He was not wearing a shirt, although it was a fairly cool morning. They noticed his jeans were wet between the knees and the ankles and he had mud on his shoes. Deputy Brant decided to investigate. Brant and Campbell gave Whitehurst a couple of minutes to finish his telephone call; then, Deputy Brant tapped him on the shoulder. Whitehurst turned around and Brant noticed he had a couple of burrs in his chest hairs. Brant told Whitehurst he was a deputy sheriff. Whitehurst's nervousness and appearance aroused Brant's suspicion.
When asked for identification, Whitehurst said he had none but gave the officers his correct name. He claimed he was hitchhiking from Fort Myers to West Palm Beach and had just called someone to pick him up. When asked how he got there, he pointed to a red car in the parking lot indicating that the driver of that vehicle had picked him up on the road. In talking to the owner of the red car, Officer Campbell learned that the driver had picked up Whitehurst in the vicinity where the boat was found.
Deputy Brant felt that he had probable cause to believe Kevin Whitehurst was involved with the boat and asked him to come to the sheriff's office. Deputy Campbell did not believe Whitehurst had committed a crime, although he was not present during all of Brant's conversation with Whitehurst. Whitehurst was read his Miranda rights at the sheriff's office but did not make any statements. Although testimony is somewhat confusing, it appears that Whitehurst was not "officially arrested" until Chief Deputy Kelly questioned him at the station.
About 10:00 a.m. Deputy Joseph Thompson saw two men walking on State Road 78. They were wet and dirty. One was wearing pants and a shirt, the other only pants. Thompson stopped them and asked for identification. One indicated that his name was Thomas E. Miller. Thompson recalled Kelly telling him the night before that one of the suspects on the boat was named Thomas E. Miller. Thompson asked *306 Miller his occupation, and Miller responded, "diesel mechanic, marine engines." Thompson also asked Miller what he was doing, where he was going, and where he had been. Miller did not respond to these questions. Deputy Thompson placed Miller and the other man in the back of his car, read them their Miranda rights, and drove them to the sheriff's office.
On August 31, 1984, the trial judge granted all four motions to suppress. He found that the stops and detentions of Arnold and Whitehurst were without a well-founded suspicion that they had committed the offense of trafficking. He determined that their subsequent arrests were without probable cause.
As to Defendant Arnold, the trial judge suppressed: any statements made by him before, during, or after his arrest; all items of personal property taken from him at his arrest and incarceration, including personal clothing; and all fingerprint cards, interview forms, and other administrative documents generated by his arrest and incarceration.
As to Defendant Whitehurst, the trial judge suppressed: any statement made by him before, during, and after his arrest; all items of personal property taken from him at the time of his arrest and incarceration, including personal clothing; and all fingerprint cards, photographs, interview forms, and other administrative documents generated by his arrest and incarceration.
Concerning Defendant Gardiner, the trial judge determined all property obtained from him was illegally seized and all statements made by him were illegally obtained. He suppressed all physical property seized from him and all statements, confessions and admissions obtained from him.
The judge found that the arrest and detention of Defendant Miller was unlawful. He suppressed the following: all statements made by Miller to law enforcement officers on March 6, 1984; all personal property items taken from him at his arrest and incarceration, including clothing; all fingerprint cards, interview forms, and other documents "incurred by" his incarceration; all photographs taken of him because of his arrest and incarceration; all statements made by him; and items of personal property taken from him referencing "Thomas E. Miller", "Thomas Eugene Miller", "Thomas Miller", and "T.E.M.".
On appeal the state raises two contentions. First, as to all defendants, it argues that the trial judge erred in finding that the sheriff's deputies did not have a well-founded suspicion to detain them. Thus, the state asserts that the trial judge improperly granted the defendants' motions to suppress. The state also asserts that the trial judge erred in suppressing Gardiner's statements. Before addressing the state's contentions as to each defendant, a brief discussion of the law permitting police officers to temporarily detain individuals under certain circumstances is appropriate.
Before an officer may stop and temporarily detain an individual, the officer must have a well-founded suspicion that the person stopped has committed, is committing, or is about to commit a crime. § 901.151(2), Fla. Stat. (1983); see, e.g., Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A "founded suspicion" must have some factual foundation in the circumstances observed by the officer when those circumstances are interpreted in light of the officer's knowledge. State v. Stevens, 354 So.2d 1244, 1247 (Fla.4th DCA 1978). See also State v. W.O.R., 382 So.2d 763 (Fla.2d DCA), petition for review denied, 388 So.2d 1120 (Fla. 1980). However, a "bare" suspicion cannot support a detention. Mullins v. State, 366 So.2d 1162 (Fla.), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979); State v. Hundley, 423 So.2d 548 (Fla.4th DCA 1982); Stevens, 354 So.2d at 1247.
However, nothing in Terry prevents a police officer from addressing questions to an individual. Lightbourne v. State, 438 So.2d 380 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 1330, 79 *307 L.Ed.2d 725 (1984). A request for identification by police does not constitute a Fourth Amendment seizure. I.N.S. v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). See also Sommer v. State, 465 So.2d 1339 (Fla.5th DCA 1985); Davis v. State, 461 So.2d 1361 (Fla.2d DCA 1985). Thus, a brief stop of an individual to determine that person's identity or maintain the status quo momentarily while obtaining more information may be reasonable in light of the facts known to the officer at the time. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

ARNOLD'S DETENTION
Deputy Hollingsworth's initial questions and request for identification of Arnold did not rise to the level of a stop or seizure. Lightbourne; Sommer; Davis. Here, Hollingsworth was investigating a resident's complaint about a suspicious boat in the area. On a marl road leading to that area, he saw a single vehicle traveling toward the main highway. After he turned down the marl road, he saw that same vehicle stopped approximately one hundred feet from the highway. Thus, it was reasonable for him to ask the occupants of the white Fiat their reasons for being in the area that night. Arnold, of course, could have refused to respond. Lightbourne; Sommer; Davis.
Further, under the totality of the circumstances, we think it was reasonable to detain Arnold for the one and one-half minutes that it took Hollingsworth to drive the short distance to investigate the boat. See State v. Merklein, 388 So.2d 218 (Fla.2d DCA 1980), petition for review denied, 392 So.2d 1377 (Fla. 1981). As noted, Hollingsworth's check on Arnold's identification revealed a prior trafficking conviction or arrest. This fact, coupled with Hollingsworth's observations of and conversations with the people he saw near the white Fiat, gave him a well-founded suspicion to ask Deputy Kunkle to detain Arnold. Once Hollingsworth discovered the bales of marijuana in front of the boat, he had probable cause to instruct Kunkle to arrest Arnold.
Thus, the trial court erred in granting Arnold's motion to suppress. Since his stop and detention were legal, the resulting information and evidence obtained from Arnold, including his voluntary statements to Hollingsworth, were admissible.

WHITEHURST'S DETENTION
The trial court was correct in suppressing the evidence obtained directly from Whitehurst. Deputy Brant testified that his suspicions were aroused by Whitehurst's personal appearance and apparent nervousness. Both Deputy Brant and Chief Deputy Kelly's testimony revealed that at this time of the year migrants and transients were frequently found in the area. Chief Deputy Kelly admitted it was not uncommon for migrants to sleep in the brush and get their clothes wet as a result. See, e.g., Freeman v. State, 433 So.2d 9 (Fla.2d DCA 1983); Kearse v. State, 384 So.2d 272 (Fla.4th DCA 1980). Moreover, it is not uncommon for innocent individuals to appear nervous when they see or talk to a sheriff's deputy. See Stanley v. State, 327 So.2d 243 (Fla.2d DCA), cert. denied, 336 So.2d 604 (Fla. 1976). Thus, we do not think the court erred in concluding that Deputies Brant and Campbell did not have a reasonable suspicion to stop and detain Whitehurst and that his subsequent arrest was without probable cause.[1]

GARDINER'S DETENTION AND STATEMENTS
The trial court also properly suppressed the evidence seized from Gardiner. *308 Deputy Brant admitted there were migrants in the area who dressed like Gardiner. Thus, like Whitehurst, Gardiner's personal appearance on the bridge was insufficient to detain him. See Freeman; Kearse. Moreover, the officers did not have probable cause to arrest him for importation and trafficking, because they had no evidence to link him with the marijuana found on or near the boat.
Further, while Kelly may have had probable cause to search the motel room, no exigent circumstances existed for him to have failed to obtain a warrant. See, e.g., Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Thus, the nonconsensual warrantless search of the motel room was illegal. Consequently, anything found there was fruit of an unlawful search and was properly suppressed as to Gardiner. See Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).
Likewise, we reject the state's argument that the trial judge erred in suppressing Gardiner's statements. Although he was given his Miranda warnings, his statements were made less than an hour after his arrest. Thus, we agree with the trial court's implicit findings that there were no intervening events to make his statements admissible, and that the repeated Miranda warnings were insufficient to erase the taint created by his illegal stop, detention, and arrest. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

MILLER'S DETENTION
The trial court erred in granting Miller's motion to suppress. Clearly, it was reasonable for Deputy Thompson to stop Miller and his companion to ask for their identification. Delgado; Royer; Sommer; Davis. When Thompson stopped Miller, he already knew that a suspect involved in the trafficking was named Thomas E. Miller. Therefore, when Miller identified himself and said he was a diesel mechanic for marine engines, Deputy Thompson had probable cause to suspect that he was the same crew member listed in the ship's log. Thus, any evidence found on Miller, his identification of himself as a diesel mechanic, and any statements made by him after Miranda warnings were admissible.
Accordingly, we affirm the trial court's order granting defendants Gardiner and Whitehurst's motions to suppress but reverse the orders granting Arnold and Miller's motions to suppress.
GRIMES, A.C.J., and OTT, J., concur.
NOTES
[1] The state argues that, in the subsequent search of the boat on August 15, 1984, Deputy Hollingsworth and the state attorney discovered a certified copy of Kevin Whitehurst's birth certificate. It urges that this certificate is admissible under the inevitable discovery doctrine of Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). We express no opinion on this matter, because it was not before the trial court.