# STATE OF FLORIDA v EVERETT
## Case No. 86 22279
Eleventh Judicial Circuit, Dade County
November 16, 1989

## OPINION OF THE COURT

URSULA M. UNGARO, Circuit Judge.

### ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

THIS CAUSE came before the Court on August 2, August 7, and October 31, 1989 on the Defendant's Motion to Suppress Statements, and the Court having heard the testimony of the witnesses, argument of counsel and otherwise being fully advised in the premises, the motion is granted based on the following findings and conclusions:

# I. FINDINGS OF FACT

1. On August 2, 1986, Shontevia Everett, a three-month-old child, died at Jackson Memorial Hospital as a result of internal injuries. Shontevia's parents, Amy Everett and Sheldon Donaldson, had reportedly discovered that the child was not breathing and alerted neighbors who immediately contacted fire-rescue. The autopsy conducted by Dr. Roger Mittleman revealed numerous injuries, including a ruptured spleen, liver and kidney of very recent origin; the autopsy also revealed numerous rib fractures, both fresh and healing, as well as a skull fracture in the healing stage.

2. At approximately 4:10 p.m. on August 3, 1986 Detectives Morin and Roberson drove to the parents' address, the Rainbow Motel, 301 Northeast 62nd Street, Unit #2, with the intention of interviewing Amy and Shelton. (T. 8, 9, 14)[1] They had not obtained arrest warrants because by their own estimation and admission they did not have probable cause to arrest either Amy or Sheldon at that time. (T. 10,64)

3. As the door to Unit #2 was padlocked from the outside, it was apparent that Amy and Sheldon were not home. (T. 9) However, the Detectives shortly observed two individuals who they believed were Amy and Sheldon. Detective Morin intercepted them and confirmed their identities. (T. 10, 96)

4. The Detectives identified themselves to Amy and Sheldon as homicide detectives investigating Shontevia's death and explained that the child had not died of natural causes. (T. 11) The Detectives then informed Amy and Sheldon to accompany them to the police station. (T. 11, 97) Amy and Sheldon agreed to go, but Amy requested that she be allowed to change her clothes. The Detectives went into the apartment with Amy; after she started to change, they waited outside. (T. 12) Amy and Sheldon were then escorted out of the motel area and transported to the police station in the rear of the Detectives' police vehicle. (T. 12)

5. Amy and Sheldon were never told they could refuse to go to the station, that they could take their own transportation, or that they could go to the station at a more convenient time.

6. They arrived at the station at approximately 4:40 p.m. (T. 15) Amy and Sheldon were taken to the 5th floor homicide office via the

---

[1] "T" refers only to the transcript of the August 2, 1989 proceedings, during which the State's witnesses testified. Detective Ilhardt and Dr. Merry Haber testified for the defense on August 7, 1989 and October 31, 1989, respectively, but transcripts of their testimony are not presently available. This Order is based on *all* of the evidence submitted to the Court, including the exhibits placed in evidence.

back elevator, to which the general public does not have access. They were then "directed" to separate interview rooms. (T. 16, 99)

7. The evidence reflects that for some eleven hours thereafter Amy's movements were severely restricted. (T. 64, 153) Basically, both Amy and Sheldon were cut-off from the outside world, they were not allowed to speak to or have any other contact with each other, and they were not allowed to leave their respective interview rooms except with the permission and supervision of the Detectives. For example, during the encounter between Amy and Sheldon described below, Sheldon was "brought" by the Detectives to the door of Amy's interview room, he was directed where to stand, and then was "taken back" to his interview room. (T. 71, 110, 137) Further, Amy was provided with no food or drink although she apparently was permitted to use the bathroom. (T. 120) She was never, *any any time*, told she was free to leave. (T. 53)

8. The Detectives decided that they would interview Amy first. (T. 17) Detective Roberson, with Detective Mrin as witness, read Amy her rights; she signed the form at 4:47 p.m. (T. 21) Although the Detectives testified that they carefully read and explained her Miranda rights before Amy executed the waiver (T. 18-21), the elapsed time is only seven minutes between arrival at the station and the execution of the waiver. During that time, the Detectives moved Amy and Sheldon from the parking area to the office, positioned them in their respective interview rooms, conferred as to who to interview first, retrieved Miranda waiver forms, read Amy her rights and obtained Amy's waiver. (T. 15, 17)

9. The arrest form sworn to by Detective Morin lists Amy's time of arrest as 4:46 p.m. on August 3, 1986. (T. 159, 171-172) However, the Detectives did not believe they had probable cause to arrest Amy until approximately 9:00 p.m. at the earliest. Further, she apparently was never advised she was under arrest until 3:00 a.m. on August 4, 1986 when she was booked.

10. From 4:46 p.m. until 5:22 p.m., the Detectives interviewed Amy. Amy denied knowing what had happened to cause Shontevia's death. The Detectives were not satisfied with her account and insisted that she had to know what had occurred because she was Shontevia's mother. (T. 26)

11. At 5:22 p.m. Detectives Morin and Roberson commenced a twenty minute interview of Sheldon. Unlike Amy, Sheldon immediately offered the Detectives an explanation—that Amy had beaten Shontevia to death. As related by Sheldon *at this juncture,* Amy had struck the

**143**

baby several times with a black shoe; Amy left the apartment to buy juice and ice; when Amy returned they started arguing again; during the argument they both discovered that Shontevia was not breathing and called for help. (T. 27-28)

12. The subsequent events reflect that Detectives Morin and Roberson thereupon seized on Sheldon's version as true simply because Sheldon was willing to provide a glib explanation consistent with their preconception that Amy must be responsible for her baby's death. (T. 69, 70, 102, 109, 141, 145) In fact, from 5:55 p.m. until after 1:00 a.m. they never questioned Sheldon again. Instead, they focused their efforts to extract a confession solely on Amy, and failing that, to obtain "corroboration" of Sheldon's story.

13. At about 5:55 the Detectives recommenced their interview of Amy. (T. 29) They were ready to apply whatever pressure was necessary. First, they insisted repeatedly that her explanation was not credible. (T. 29, 142-143) Amy nonetheless continued to deny hitting or harming the baby in any way. The Detectives then confronted her with Sheldon's accusations. Amy, however, refused to believe that Sheldon had accused her. (T. 30)

14. The Detectives next decided to have Sheldon confront Amy with his accusations. (T. 71-72) The ensuing face-to-face confrontation was highly emotional and degenerated into a shouting match which the Detectives physically broke up by taking Sheldon back to his interview room. (T. 71, 111)

15. Amy had begun to cry and was upset and agitated. (T. 71) The Detectives continued to press her, expressing disbelief in her denials, and insisting that Amy must show the source of her child's injuries. They also advised Amy, falsely, that they had witnesses other than Sheldon to her having beaten Shontevia. (T. 142-143)

16. Amy then made several inconsistent incriminating statement, all of which she retracted as soon as the Detectives sought clarification or details. (T. 72, 74) The statements were:

a) That she hit the baby with a shoe, not the black shoe Sheldon describes, but rather a tennis shoe. (This statement was immediately restricted) (T. 43, 138);

b) That the baby could have been injured when she and Sheldon were fighting one day and they both feel onto the bed, knowing the baby into the wall (T. 112);

c) That the baby could have been injured when Amy's two-year old child dropped a toy on the baby's head. (T. 33)

144

17. The above statements and the manner in which the above described interview was conducted are fairly reflected in the taped statement taken from Amy between 11:13 p.m. and 1:00 a.m. (T. 52)

18. By 9:00 p.m. the Detectives believed they had probable cause to arrest Amy based on Sheldon's statement and Amy's several inconsistent statements. (T. 84, 144-45) However, due to retractions, the Detectives were concerned that Amy had made the statements—particularly the statement that she had hit the baby with a tennie shoe—*not* because they were true, but to mollify her interrogators. (T. 138) Therefore, the Detectives ceased questioning Amy and turned their attention to buttressing their conclusion that Amy was laying and Sheldon was telling the truth. (T. 76) From 9:00 p.m. until 11:13 p.m. when the taping began, Amy remained alone in the interview room isolated from any contact with anyone. (T. 149)

19. At about 9:50 p.m. the Detectives contacted the medical examiner to see if he could confirm the injuries were consistent with Sheldon's story. The medical examiner, however, was unable to say. (T. 48-49)

20. Next, the Detectives made the remarkable decision to have Sheldon, *but not Amy,* polygraphed. (T. 118, 140, 149) Detective Ronald Ilhardt, the polygraph examiner, testified that he advised against administering the polygraph to Amy because in his opinion her inconsistent statements and retractions would affect the reliability of the test results. However, the evidence also reflects that not only did Sheldon make incriminating and inconsistent statements to Ilhardt during the polygraph examination and the post-polygraph interview, but that Sheldon failed the polygraph. (T. 82, 147) The court accepts Ilhardt's testimony that, at a minimum, he advised Detectives Morin and Roberson that Sheldon had failed the polygraph. Yet, Detectives Morin and Roberson simply opted to disregard the results. Further, they never reconsidered their decision not to offer a polygraph to Amy.

21. In the tape statement taken from Amy, the Detectives confront her and press her on every conceivable inconsistency. She nonetheless denies even striking the baby and explains her earlier admissions. She also reports that Sheldon caused her to lie in the past about the baby's injuries.

22. In the taped statement taken from Sheldon starting at about 1:53 a.m., Sheldon makes numerous statements which conflict with his statements to Ilhardt and his earlier statement to Detectives Morin and Roberson. (T. 217-218) Yet Sheldon is never confronted with his inconsistencies or pressed for details and clarification. (T. 130-135)

145

23. Amy was booked for the murder of her child at 3:00 a.m. Sheldon was returned home.

24. Army has an I.Q. of 65 and a mental age of a ten year old child. She is passive and submissive and can be easily manipulated.

## II. CONCLUSIONS OF LAW

1. The Defendant was involuntarily and illegally detained beginning at 4:40 p.m. on August 3, 1986, when she was intercepted by Detective Morin outside her home. *Dunaway v New York,* 442 U.S. 200 (1979); *Cason v State,* 524 So.2d 422 (Fla. 1988); *Drake v State,* 441 So.2d 1079 (Fla. 1983); *B.S. v State,* 14 FLW 2143 (3d DCA 9/22/89). The facts supporting this conclusion are contained in paragraphs one through nine above.

2. The Defendant's waiver of her Miranda rights did not remove the taint of the illegal detention because they are no intervening events sufficient to break the chain of causation between the arrest and her statements. *Brown v Illinois,* 422 U.S. 590 (1985); *State v Arnold,* 475 So.2d 301 (Fla. 2d DCA 1985); *State v Rogers,* 427 So.2d 286 (Fla. 1st DCA 1983).

3. The Defendant's post arrest statements were not voluntary, but the product of coercion. *Brewer v State,* 386 So.2d 232 (Fla. 1980); *Colorado v Connelly,* 107 S.Ct. 515 (1986); *Richard v State,* 508 So.2d 736 (Fla. 3d DCA 1987); *Williams v State,* 441 So.2d 653 (Fla. 3d DCA 1983).

4. As the Defendant's statements were the produce of an illegal detention and coercion, they must be suppressed.

DONE and ORDERED this 16th day of November, 1989.